**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **JOHN HOLMES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action File No.:** |
| **v.** | ) | 1:17-cv-05030-MHC-LTW |
| | ) | |
| **GWINNETT AUTOMOTIVE** | ) | |
| **COMPANY d/b/a GWINNETT** | ) | **JURY TRIAL DEMANDED** |
| **PLACE HONDA and HENDRICK** | ) | |
| **AUTOMOTIVE GROUP,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff John Holmes ("Mr. Holmes"), by and through undersigned counsel, and files this First Amended Complaint for Damages (this "Complaint") against Defendants Gwinnett Automotive Company d/b/a Gwinnett Place Honda and Hendrick Automotive Group, showing the Court as follows:

## JURISDICTION AND VENUE

1.

Mr. Holmes brings this action as a result of Defendants' violations of the anti-discrimination and anti-retaliation provisions of the Americans with

Disabilities Act, 42 U.S.C. §§ 12101, *et seq*. (the "ADA") and the Family and Medical Leave Act of 1993 (the "FMLA").

2.

This Court has subject matter jurisdiction over the instant action pursuant to 28 U.S.C. § 1331.

3.

Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391 (b) because the acts giving rise to this Complaint occurred within this District, and because this Court has personal jurisdiction over Defendants.

## THE PARTIES

4.

Plaintiff John Holmes ("Mr. Holmes") is an individual and a resident of the State of Georgia.

5.

Defendant Gwinnett Automotive Company d/b/a Gwinnett Place Honda ("Gwinnett Place") is an organization with a principal operating address of 3325 Satellite Blvd., Duluth, GA 30096.

6.

Defendant Hendrick Automotive Group ("Hendrick") is an automotive retail organization based in North Carolina with holdings in Gwinnett Place and other dealership entities. Hendrick's principal office address is 6000 Monroe Road, Suite 350, Charlotte, NC 28212-1517.

7.

At all times material hereto, Mr. Holmes was an employee of Hendrick and Gwinnett Place (collectively, "Defendants") at the Hendrick Collision Center located at 3325 Satellite Blvd, Duluth, GA 30096 (the "Collision Center").

8.

At all times material hereto, Defendants were each a private sector employer engaged in commerce or in an industry affecting commerce, and each had 50 or more employees for each working day in 20 or more workweeks in the calendar years relevant to this Complaint.

9.

At all times material hereto, Defendants had at least 50 employees within a 75-mile radius of the Collision Center.

10.

Mr. Holmes was an employee entitled to leave under the FMLA based on the fact that he was employed by Defendants for at least 12 months and had

worked at least 1,250 hours during the relevant 12-month period prior to his seeking to exercise his rights to FMLA leave.

11.

At all times material hereto, Defendants each exercised control over significant aspects of the operations of the Collision Center, including human resource management and employee benefits, and each of the Defendants played a substantial role in causing the ADA and FMLA violations set forth in this Complaint.

12.

At all times material to this action, Defendants were Mr. Holmes' "joint employer" for purposes of the FMLA and the ADA due to an arrangement between the Defendants to share the services of Mr. Holmes, and/or because one of the individual Defendants acted directly or indirectly in the interest of the other Defendant in relation to Mr. Holmes, and/or because the individual Defendants shared control of Mr. Holmes' employment, and/or because one Defendant controls the other Defendant.

## FACTUAL ALLEGATIONS

13.

Mr. Holmes initially began working for Defendants as a Body Shop Helper in December 2011 before transitioning into the position of Collision Center Estimator.

14.

While working as an Estimator in 2015, Mr. Holmes began experiencing constant headaches, persistent anxiety, and short term memory loss, among other symptoms, all of which resulted from a head injury sustained in April 2009.

15.

When these symptoms continued to worsen, Mr. Holmes requested FMLA leave to seek further treatment, and Defendants granted this request on October 27, 2015.

16.

Immediately after Mr. Holmes' FMLA leave began, Mr. Holmes' wife spoke with regional manager Brian Eve to update him on Mr. Holmes' medical treatment and FMLA paperwork and to discuss accommodations Mr. Holmes expected to need in order to return to work. During that conversation, Mr. Eve denied that *any* accommodations could be made to allow Mr. Holmes to perform the essential duties of his position, stating that because the job was commission-based, any such accommodations would cost Defendants too much money.

17.

While out on FMLA leave, Mr. Holmes stayed in contact with Defendants about his condition, and Mr. Holmes returned to work with only minor scheduling restrictions within a few weeks.

18.

Upon his return from leave, Mr. Holmes learned that several work tickets were closed in someone else's name, despite the fact that Mr. Holmes himself had performed the work. As a result, Mr. Holmes did not receive commission for this work. When Mr. Holmes asked his direct manager, Tom Roche, about why this had occurred, Mr. Roche claimed that the paperwork for these assignments had to be corrected due to errors; however, Defendants neither explained Mr. Holmes' alleged mistakes nor offered any type of work modification or accommodation to assist Mr. Holmes in performing his job going forward.

19.

On or about December 7, 2015, Mr. Holmes received a partial diagnosis of unspecified neurocognitive disorder, recurrent major depressive disorder, and anxiety disorder. Shortly thereafter, Mr. Holmes' treating neuropsychologist reduced this diagnosis to writing and provided a list of suggested accommodations for Mr. Holmes to return to work, including providing Mr. Holmes with

uninterrupted time to return phone calls and allowing Mr. Holmes to record meetings and take written notes on verbal instructions.

20.

Immediately after relaying the written diagnosis and suggested accommodations to Defendants, on December 21, 2015, Mr. Holmes was demoted to a low-wage Porter or "door greeter" position.

21.

Although Mr. Holmes objected to this demotion, Defendants claimed that Mr. Holmes could no longer be an Estimator due to his doctor's suggestion of working in an hourly (versus commission-based) position to reduce stress; however, this was merely one of numerous suggestions, not an actual restriction, and Mr. Holmes was confident he could perform the essential duties of the Estimator position without the demotion "accommodation" forced upon him.

22.

The Porter position was presented as a "take it or leave it" offer, and Defendants led Mr. Holmes to believe he would be terminated if he did not accept the demotion.

23.

Defendants did not offer or attempt any accommodations to allow Mr. Holmes to perform his Estimator duties before demoting Mr. Holmes out of that role.

24.

Given Mr. Eve's earlier insistence that *no* accommodations could be made for Mr. Holmes in the Estimator role, Defendants' assertion that the demotion was forced upon Mr. Holmes to "help" him was mere pretext. Nevertheless, Defendants assured Mr. Holmes that "when he felt better" his job would be waiting for him.

25.

On January 18, 2016, Mr. Holmes was formally diagnosed with post-traumatic stress disorder, major depressive disorder, generalized anxiety disorder, and mood disorder due to traumatic brain injury from the April 2009 car accident.

26.

After relaying this diagnosis to Defendants, Mr. Holmes' work environment continued to worsen. His managers and co-workers began avoiding him, teasing him about his disability, or else communicating to him sarcastically or with exasperation. He was written up for trivial issues, without any investigation or

follow up to determine whether the write ups were justified, and for conduct that other similarly-situated employees were not disciplined.

27.

When Mr. Holmes raised concerns of discrimination and retaliation with Defendants' human resources department, his managers cornered him and accused him of being unhelpful and not good with customers, even though he had always previously been praised for excellent customer service.

28.

In late 2016, Defendants reinstated Mr. Holmes to the Estimator position he previously held.

29.

Prior to his reinstatement as an Estimator, Mr. Holmes repeatedly requested that he be allowed to return to the Estimator position or else be placed in another position with similar pay.

30.

Defendants initially denied having any other appropriate positions available, then ultimately offered Mr. Holmes a position scanning vehicles coming through the dealership and body shop, which Mr. Holmes readily accepted. Defendants informed Mr. Holmes that he would be placed in that position once the scanning

equipment was delivered to the dealership; however, when the equipment arrived, this position was given to another individual. The other individual was not disabled and had not taken FMLA leave.

31.

Defendants also offered Mr. Holmes an outside or mobile Estimator position. A few weeks later, that position was given to another individual. The other individual was not disabled and had not taken FMLA leave.

32.

After Mr. Holmes again raised concerns of discrimination and retaliation, and during the time Mr. Holmes was seeking to return to work full-time without scheduling restrictions, Mr. Eve and Mr. Roche called Mr. Holmes into a meeting wherein they repeatedly made statements to the effect that maybe working at Gwinnett Place was not for him. The statements made and the circumstances in which they were made led Mr. Holmes to reasonably believe that Defendants wanted him to quit or else were looking for ways to terminate him.

33.

The discrimination and retaliation did not stop when Mr. Holmes returned to the Estimator position, and he was consistently singled out and held to higher standards than his co-workers in the same position.

34.

Although Defendants had previously assured Mr. Holmes that all of his prior direct repair program (DRP) accounts would be returned to him, Defendants ultimately refused to do so, stating that they could not take the accounts away from others who the accounts had already been reassigned to. This is significant because having DRP accounts essentially guarantees payment for an Estimator's work, whereas non-DRP and "customer pay" work is contingent on other factors and often results in work without commission.

35.

There were eight other Estimators at the Collision Center, none of whom were disabled or had taken FMLA leave. Out of the nine Estimators, Mr. Holmes was the only one who did not have his own DRP accounts, despite the fact that several Estimators were hired after Mr. Holmes. As a result, Mr. Holmes did not have a steady, guaranteed stream of work like all other similarly-situated employees. When Mr. Holmes addressed this with his manager, he was told that he could try to find his own DRP accounts or else hand out business cards at other dealerships and offer them a "kick back" on any work sent to him, in order to drum up business. No other Estimator had to do this—they were simply given their accounts.

36.

As a result, Mr. Holmes was only performing non-DRP or "customer pay" estimating work. This type of work is assigned by the receptionists as it comes in; however, the receptionists consistently and intentionally passed Mr. Holmes over in favor of other Estimators with respect to work assignments, even when those other Estimators were extremely busy and had dedicated DRP accounts of their own from which to earn commission. Thus, Mr. Holmes' pay suffered as a direct result of Defendants' discrimination and retaliation.

37.

Out of the nine estimators, Mr. Holmes was the only one who did not have a dedicated technician assigned to assist him with his work. Rather, he was forced to go around and ask others' technicians if they had time to help. They consistently claimed they were too busy to help. Subsequently, Mr. Holmes learned that one of the technicians was expressly telling others not to perform any work for Mr. Holmes.

38.

Throughout 2017, Mr. Holmes was repeatedly taken off of his job to work the front desk, for no additional pay, when receptionists were late for their shifts. Though several other Estimators worked the same hours as Mr. Holmes,

Mr. Holmes was asked to take over for the receptionists far more frequently than others.

39.

On at least one occasion directly after Mr. Holmes complained about being discriminated and retaliated against, the Collision Center held a meeting with all other Estimators, but did not inform Mr. Holmes of the meeting and did not request his attendance. Mr. Holmes was the only Estimator left out of the meeting.

40.

In July 2017, Mr. Holmes was formally written up for not meeting his monthly production goals. Although several other Estimators also failed to meet their monthly goals, none of them were written up. Mr. Holmes raised this issue with Defendants' human resources department and was told they would look into. The next day, another Estimator was written up for failing to meet his goals. That Estimator was not written up until after Mr. Holmes asked why he had been singled out, and none of the other Estimators who failed to meet their numbers at that time were ever written up.

41.

On August 1, 2017, Mr. Holmes was informed that he would be written up again for not meeting his July goals and that this would be his "final warning"

before termination. Despite the fact that only *one* Estimator met his July goals, Mr. Holmes was again singled out.

42.

In August 2017, Mr. Holmes discovered that he was the *only* Estimator not included on the "Collision Center Staff" page of the Collision Center's website.

43.

On August 25, 2017, Mr. Holmes asked his manager whether he was ever going to be given DRP accounts or otherwise subjected to the same treatment enjoyed by his co-workers. His manager indicated that he would not. As a result of the discrimination, retaliation, interference, and harassment he endured over the previous two years, as well Defendants' obvious desire to force him out, Mr. Holmes resigned his employment on the same day.

44.

From the date Mr. Holmes first notified Defendants of his disability, until the date Mr. Holmes was constructively discharged, Mr. Holmes requested that Defendants provide him with certain reasonable accommodations to allow him to perform the essential duties of his various positions. Although Defendants agreed to all or most of these accommodations, they generally failed to abide by the agreed upon accommodations. For example, to assist with his short-term memory

loss, Mr. Holmes requested that he be allowed a few minutes to write down where he left off in the event he was called away from work. Defendants agreed to provide this accommodation, but frequently failed to do so, instead chastising Mr. Holmes for being a few minutes late to meetings or else telling Mr. Holmes he had to assist a customer immediately or else the work would be assigned to someone else.

45.

From the date Mr. Holmes first notified Defendants of his disability, until the date Mr. Holmes was constructively discharged, Defendants engaged in a pattern and practice of discriminatory treatment based upon Mr. Holmes' disability, need for and use of FMLA leave, and complaints of discrimination.

46.

On August 25, 2017, Mr. Holmes filed a charge of discrimination with the EEOC based on Defendants' failure to provide reasonable accommodations under the ADA, constructive discharge, disability-based discrimination, and retaliation.

47.

On January 11, 2018, the EEOC issued Mr. Holmes a Notice of Right to Sue on his charge. A true and correct copy of the Notice of Right to Sue is attached hereto as Exhibit A.

48.

Mr. Holmes has exhausted all administrative remedies and has satisfied all conditions precedent to the filing of this action.

## COUNT ONE
## (FMLA – INTERFERENCE)

49.

Mr. Holmes realleges and incorporates Paragraphs 1 through 48 of this Complaint, as if fully set forth herein.

50.

At all times relevant hereto, Mr. Holmes suffered from a "serious health condition" and was an "eligible employee" within the meaning of the FMLA.

51.

By demoting Mr. Holmes to a low-paying position and refusing to allow Mr. Holmes to return to his pre-leave position or an equivalent position upon return from FMLA leave, Defendants interfered with Mr. Holmes' exercise of his rights to FMLA leave.

52.

Defendants further interfered with Mr. Holmes' exercise of his FMLA rights by failing to provide Mr. Holmes with "equivalent pay" pursuant to 29 CFR §

825.215(c) when Defendants refused to pay Mr. Holmes commission on work that was closed while Mr. Holmes was out on FMLA leave.

53.

Defendants' violations of the FMLA were willful, intentional, and in bad faith.

54.

As a result of Defendants' FMLA interference, Mr. Holmes is entitled to damages, including but not limited to back pay, front pay, liquidated damages, and attorneys' fees and costs.

**COUNT TWO**
**(FMLA – DISCRIMINATION & RETALIATION)**

55.

Mr. Holmes realleges and incorporates Paragraphs 1 through 54 of this Complaint, as if fully set forth herein.

56.

At all times relevant hereto, Mr. Holmes suffered from a "serious health condition" and was an "eligible employee" within the meaning of the FMLA.

57.

Defendants intentionally and in bad faith discriminated and retaliated against Mr. Holmes on the basis of his need for and use of FMLA leave, as well as his

complaints of discrimination, by demoting him following his use of FMLA leave, denying Mr. Holmes' earned commissions, subjecting Mr. Holmes to unfair treatment and harassment, creating or allowing a hostile work environment, treating Mr. Holmes less favorably than other similarly-situated employees who have not taken FMLA leave, using Mr. Holmes' FMLA leave as a negative factor for the purpose of hiring and promotion decisions, attempting to force Mr. Holmes out of the company by denying him equal wage earning opportunities, and constructively discharging Mr. Holmes.

58.

As a result of Defendants' discrimination and retaliation, Mr. Holmes is entitled to damages, including but not limited to back pay, front pay, liquidated damages, and attorneys' fees and costs.

**COUNT THREE**
**(ADA – FAILURE TO ACCOMMODATE)**

59.

Mr. Holmes realleges and incorporates Paragraphs 1 through 55 of this Complaint, as if fully set forth herein.

60.

At all times relevant hereto, Mr. Holmes was a qualified individual with a disability, or alternatively was perceived by Defendants as being disabled, within the meaning of the ADA.

61.

Following his medical diagnosis of post-traumatic stress disorder, major depressive disorder, generalized anxiety disorder, and mood disorder secondary to traumatic brain injury, Mr. Holmes requested reasonable accommodations which would have allowed Mr. Holmes to perform the essential functions of his job.

62.

Defendants could have provided the requested accommodations without undue hardship to Defendants

63.

Rather than engage in the interactive process required by the ADA, Defendants forced a demotion on Mr. Holmes.

64.

Rather than provide the reasonable accommodations requested by Mr. Holmes and agreed to by Defendants, Defendants routinely denied Mr. Holmes these accommodations.

65.

By failing to provide Mr. Holmes with reasonable accommodations, Defendants willfully violated the ADA, in bad faith.

66.

As a result of Defendants' failure to accommodate Mr. Holmes as required by the ADA, Mr. Holmes is entitled to damages, including but not limited to back pay, front pay, compensatory damages, punitive damages, and attorneys' fees and costs.

**COUNT FOUR**
**(ADA – DISCRIMINATION & RETALIATION)**

67.

Mr. Holmes realleges and incorporates Paragraphs 1 through 66 of this Complaint, as if fully set forth herein.

68.

At all times relevant hereto, Mr. Holmes was a qualified individual with a disability, or alternatively was perceived by Defendants as being disabled, within the meaning of the ADA.

69.

Following his medical diagnosis of post-traumatic stress disorder, major depressive disorder, generalized anxiety disorder, and mood disorder secondary to traumatic brain injury, Defendants continually and willfully discriminated against

Mr. Holmes in violation of the ADA by treating him less favorably than other similarly-situated employees not suffering from a disability, routinely criticizing Mr. Holmes for minor or perceived mistakes caused by his disability, creating or allowing a hostile work environment, and attempting to force Mr. Holmes out of the company by denying him equal wage earning opportunities.

70.

Defendants engaged in a continuous pattern of harassment and discriminatory treatment from the time Defendants first became aware of Mr. Holmes' disability to the time of Mr. Holmes' constructive discharge.

71.

Although Mr. Holmes reported the discriminatory treatment he received to Defendants, Defendants' treatment of Mr. Holmes only worsened as a result.

72.

Although Mr. Holmes "resigned" his employment with Defendants, the termination of Mr. Holmes' was involuntary because (a) Defendants deliberately created intolerable working conditions and (b) Defendants consistently acted in a manner such that a reasonable employee in Mr. Holmes' position would believe he was going to be terminated.

73.

As a result of Defendants' discrimination, retaliation, and constructive discharge in violation of the ADA, Mr. Holmes is entitled to damages, including but not limited to back pay, front pay, compensatory damages, punitive damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Holmes prays that the Court:

(a) Enter judgment in favor of Mr. Holmes and against Defendants for all damages and relief allowed by law;

(b) Award Mr. Holmes litigation expenses and costs against Defendants, including attorneys' fees, pursuant to applicable law; and

(c) Provide such other and further relief as this Court deems just and proper.

Respectfully submitted this 23rd day of January, 2018.


***/s/ Michelle L. Wein***
MICHELLE L. WEIN
Georgia Bar No. 385424
3340 Peachtree Rd. NE, Ste. 2570
Atlanta, Georgia 30326
(404) 981-6679 (telephone)
(470) 276-3033 (facsimile)
mwein@mweinlaw.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing *Plaintiff's First Amended Complaint for Damages* was electronically filed using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

Tillman Y. Coffey
John W. Stapleton
FISHER & PHILLIPS LLP
1075 Peachtree St. NE, Ste. 3500
Atlanta, Georgia 30309
tcoffey@fisherphillips.com
jstapleton@fisherphillips.com

This 23rd day of January, 2018.

***/s/ Michelle L. Wein***
MICHELLE L. WEIN
Georgia Bar No. 385424
3340 Peachtree Rd. NE, Ste. 2570
Atlanta, Georgia 30326
(404) 981-6679 (telephone)
(470) 276-3033 (facsimile)
mwein@mweinlaw.com
*Counsel for Plaintiff*